UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORIS LAURY,

                Plaintiff,                         Civil Action No. 12-13511

        v.                             District Judge Bernard A. Friedman
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]**

Plaintiff Doris Laury appeals the Defendant Commissioner of Social Security's denial of her application for social security benefits. Laury believes she is entitled to disability benefits because her anxiety, panic attacks, and depression prevent her from working a full-time job. A psychologist who has examined Laury on more than one occasion, and has discussed Laury's treatment with Laury's primary-care physician, agrees. Another psychologist, however, one who has not examined Laury and simply reviewed a medical file as it existed more than two years before the Commissioner's disability determination, disagrees. The social security regulations provide that, as a general matter, an opinion by a psychologist who has had the opportunity to examine a claimant should be given more weight than the opinion of one who has not. An Administrative Law Judge acting on behalf of the Commissioner gave reasons for deviating from this general rule, but several of them lack substantial evidentiary support. This Court believes that these errors prejudiced Laury's case for disability benefits. Accordingly, for the reasons that follow, this Court RECOMMENDS

that Plaintiff's Motion for Summary Judgment (Dkt. 8) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 10) be DENIED, and that this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## I. BACKGROUND

Laury has suffered from anxiety and panic attacks since she was a teenager. (Dkt. 5, Administrative Transcript, ("Tr.") 236.) For most of her life, however, she was able to manage those conditions and eventually worked as a manager in a machine shop for six years. (*See* Tr. 29, 47.) In 2000, however, when Laury was 41 years old (*see* Tr. 109), her mental impairments were exacerbated by her son's murder of his girlfriend: Laury lost her son to prison, lost her son's girlfriend, whom she "loved as . . . [a] daughter," and has not been permitted to see her grandson, the former couple's son. (Tr. 38, 41, 236.) Laury stopped working at the machine shop in 2000. (*See* Tr. 137.)

Still, in 2006, Laury completed an associates degree in paralegal studies (Tr. 28) and then worked as a dental assistant for about a year during 2006-07 (Tr. 137). In May 2007, the dentist Laury worked for became dissatisfied with her work and advised Laury to see a doctor for her mental and emotional impairments. Laury was then 48 years old and has not worked since.

In April 2008, Laury applied for Social Security benefits. Later that year, Laury faced another tragedy: her daughter, seven month's pregnant, was killed in an automobile related death that Laury believes was non-accidental. (Tr. 42-43.)

### A. Procedural History

On April 17, 2008, Laury applied for disability insurance benefits asserting that she became unable to work on May 9, 2007. (Tr. 10.) The Social Security Administration initially denied her

2

application on August 11, 2008. (*Id.*) Laury then requested an administrative hearing, and on November 12, 2010, she testified before Administrative Law Judge Michael Hellman. (*Id.*) Upon hearing Laury's testimony and considering her case *de novo*, on January 12, 2011, ALJ Hellman concluded that Laury was not disabled within the meaning of the Social Security Act. (*See* Tr. 10-19.) The ALJ's decision became Defendant Commissioner of Social Security's final decision on June 12, 2012, when the Administration's Appeals Council denied Laury's request for further administrative review. (Tr. 1.) This suit followed. (Dkt. 1, Compl.)

**B. Medical Evidence**

*1. Medical Evidence Before the Alleged Disability Onset Date*

In May 2004, Laury went to the emergency room with chest pain. (Tr. 229-30.) Dr. Gary Brooks, Laury's primary-care physician, completed the discharge summary. (*Id.*) He noted that Laury received "good relief" from Darvocet and Xanax, and that she was also prescribed Pepcid. (*Id.*) Her discharge diagnoses were "[a]typical chest pain/peptic ulcer disease." (Tr. 230.)

At her June 2004 follow up with Dr. Brooks, the physician noted that Laury had a history of generalized anxiety disorder for which she had been taking Xanax. (Tr. 218.) He prescribed Klonopin for Laury's anxiety. (*Id.*) The next month, Dr. Brooks noted, "[Ms. Laury] states [she is] doing fine on lipitor/klonopin [and] aciphex" (Aciphex had been prescribed for Laury's peptic ulcer disease and Lipitor for her hypertension). (Tr. 217.)

In February 2005, however, Laury reported to Dr. Brooks that Klonopin was not helping her anxiety. (Tr. 215.) Dr. Brooks therefore prescribed Xanax and Buspar. (*Id.*) The medication change apparently caused a rash, and Laury reported that she could not tolerate Buspar. (Tr. 214.) Dr. Brooks diagnosed "panic attacks" and prescribed Paxil and Xanax. (*Id.*)

3

Between May 2005 and April 2007, it appears that Laury merely left phone messages with Dr. Brooks requesting medication refills. (Tr. 206-11.) In September 2006, Dr. Brooks provided three months' worth of Xanax, 0.5 mg, twice daily. (Tr. 207.) In April 2007, Dr. Brooks provided another refill of Xanax, but noted that it would be Laury's last unless she came in for an examination. (Tr. 206.)

On May 9, 2007, Laury's alleged disability onset date, Laury returned to Dr. Brooks. (Tr. 205.) The relevant parts of his notes are brief: "[patient] presents [with] gen. anxiety. Denies [chest pains]/[shortness of breath]" and "[diagnosis:] gen. anxiety—Xanax, 0.5 mg [twice daily]." (Tr. 205.)

### 2. Medical Evidence After the Alleged Disability Onset Date

In November 2007, Laury went to the emergency room because she was feeling very anxious. (Tr. 225.) Her heart rate was 130 beats per minute. (Tr. 225.) At discharge, Laury was feeling "much better" and was "anxious to go home." (*Id.*) The attending physician advised that Laury should inform her primary-care physician that "she is having problems with severe anxiety panic attacks." (*Id.*)

Following this recommendation, Laury saw Dr. Brooks later in November. (Tr. 204.) His notes are again brief. (*Id.*) He provided that Laury was unable to tolerate either Paxil or Buspar, and that she was having two to three panic attacks per week. (*Id.*) He prescribed Xanax, at either 1 or 0.5 mg (the notation is not legible), twice daily. (Tr. 204.)

Laury next saw Dr. Brooks six months later, in June 2008. (Tr. 265.) Laury reported a fast heart rate, shaking, and a lump in her throat. (*Id.*) Although Dr. Brooks' brief notes are difficult to read, he apparently diagnosed hypertension, goiter, and panic attacks; regarding the last, he

4

prescribed Paxil and Xanax. (*Id.*)

In July 2008, Ellen Walker, a limited licensed psychologist, and Dr. Mark Zaroff, a licensed psychologist, evaluated Laury for Michigan's Disability Determination Service, a state agency that helps the Social Security Administration evaluate disability claimants. (Tr. 236-39.) In describing her anxiety, Laury said that she worried about bad things happening to her family and that this caused her to lose sleep and check the windows and doors at night. (Tr. 236.) Laury reported that her anxiety symptoms also included crying a lot, and feeling jittery, frustrated, out of control, and like she wanted to scream. (*Id.*) Laury told Dr. Zaroff and Walker that, when she had a panic attack, she would experience shortness of breath, tachycardia, dizziness, shaking, trembling, and restlessness. (*Id.*) She explained that she had these attacks daily, but that she had not gone to the hospital since November 2007 because of insurance problems. (*Id.*) Laury also reported, however, that she was learning to control the panic attacks. (*Id.*)

Upon evaluation, Walker and Dr. Zaroff found that Laury "appeared depressed," and "exhibited [a] depressed/anxious affect." (Tr. 238.) Her "thought pattern was logical and goal directed," however, and she performed well on memory tests. (Tr. 238.) Laury had problems with some calculations: she knew that 5 x 5 was 25 but thought that 8 x 7 was 54; she also completed the tasks of repeatedly subtracting 3 starting from 31, a test of concentration, "very slowly." (Tr. 238.) Walker and Dr. Zaroff diagnosed Adjustment Disorder with Mixed Anxiety and Depression, Dysthymic Disorder, and assigned a Global Assessment Functioning score, a subjective evaluation of functioning on a 1 to 100 scale, of 45. (Tr. 239.)

The next month, August 2008, Dr. Bruce Douglass, a psychologist, reviewed Laury's medical file and opined on her functional limitations. In rating three criteria used to determine

5

whether Laury's impairments met or equaled one of the Administration's listed mental impairments, Dr. Douglass opined that Laury had "mild" restrictions in activities of daily living, "moderate" difficulties in social functioning, and "moderate" difficulties in concentration, persistence, or pace. (Tr. 252.) In assessing Laury's residual functional capacity, i.e., what he thought Laury could still do despite her impairments, Dr. Douglass wrote,

> Claimant will have trouble with complex tasks. Cognition is intact, but concentration will vary. Social functioning is intact. Self care and adaptation are grossly [within normal limits.] She retains the capacity to perform simple, routine, 2-step tasks on a sustained basis.

(Tr. 258.)

In September 2008, Laury sought mental-health treatment; Dr. Georgia Conic, a psychiatrist, examined Laury and completed an "Assessment Report." (Tr. 392-95.) Laury told Dr. Conic that her panic attacks had been occurring once or twice a week, and had increased in both intensity and frequency over the past six months. (Tr. 392.) Dr. Conic thought that Laury's "concentration appear[ed] to be markedly impaired." (Tr. 394.) She also remarked, "[a]ttention span appeared to be markedly impaired." (*Id.*) Laury's "[t]hought process revealed paranoid ideation, irrational fears, poor self image and self-esteem." (*Id.*) Laury reported that she felt as though she could not function due to voices that constantly taunted her. (*Id.*) More specifically, Laury reported "a history of auditory and visual hallucinations which have increased over the past six months. She describe[d] clown like characters that follow her and tell her to hurt herself or others." (Tr. 395.) Dr. Conic assigned Laury various ratings, including an "Unresolved Grief Rating" of 90% and an "Obsessive Compulsive Rating" of 100%. (Tr. 393.) Dr. Conic diagnosed Schizophrenia, Paranoid Type, Panic Disorder without Agoraphobia, Depressive Disorder, and Dependent Personality Disorder. (*Id.*) She assigned a GAF score of 31-40. (*Id.*)

6

Also in September 2008, Laury began treating with a counselor who worked in Dr. Conic's office, Brenda Beverly. From that time through at least 2010, Laury attended weekly or twice-weekly sessions with Beverly. (*See* Tr. 300-375, 396-409.) A frequent topic was Laury's grief over her deceased daughter. Upon a review of the therapy notes, it appears there were periods where Laury's symptoms decreased and her mood improved; on the whole, however, it appears that Laury's condition did not improve over the course of her treatment with Beverly. The following summary of the therapy notes illustrates this.

On a mid-November 2008 self-assessment form, Laury reported that her mood was a two on a ten-point scale and that her ability to stay calm or stop crying had not improved. (Tr. 365.) At the end of 2008, however, Laury reported progress, and Beverly noted that Laury was in an "upbeat mood" and was continuing to "journal." (Tr. 360.) But by February 2009, Beverly described Laury as "regressing": Laury reported spending the majority of her days in bed, lacking the desire to do anything, and missing her daughter. (Tr. 356.) The next month, Laury expressed pain over her deceased daughter's birthday. (Tr. 347, 350-51.)  At that time, Laury was "very forgetful" and had problems concentrating. (Tr. 345.)

In April and May 2009, it appears that Laury again experienced progress with her symptoms. In April, Beverly remarked that Laury was calm and her attitude pleasant; Laury also expressed progress with her grief. (Tr. 343.) And in May, Beverly noted a decrease in depression and "progress [with] grief and concentration. [Laury] further reports that she is seeing significant benefits from relaxation techniques." (Tr. 335-36.)

In September 2009, however, Laury told Beverly that her panic attacks had increased; she also feared facing the one-year anniversary of her daughter's death. (Tr. 322.) The day after the

7

anniversary of her daughter's funeral, Beverly noted that Laury's mood was depressed, her "tone sad," and that Laury was "emotionally tearful[.]" (Tr. 320.) In October, Laury reported anxiety and "overwhelming fear of leaving the house." (Tr. 325.) In December 2009, Beverly wrote, "[c]lient complains of depression, sleep[;] often burns food while sitting in kitchen; loss of interest in anything." (Tr. 312.) In January 2010, Laury "verbalized feeling of regress [with her] emotional state" and a "lack of desire to engage in social activities [with] anyone." (Tr. 309.)

Still, in February 2010, Beverly described Laury's affect as "bright" and Laury commented on her progress with her medication and with her destressors of yoga and journaling. (Tr. 308.)

Yet, by the end of February, Laury was experiencing depressive episodes despite her medication and was distressed over her daughter's death. (Tr. 305.) Similarly, in March 2010, Laury told Beverly that she was depressed and angry due to the loss of her daughter and that everything bothered her. (Tr. 303-04.) In April 2010, Beverly wrote, "client reports she's not feeling well [and] has no desire to do anything for herself." (Tr. 302.) Similarly, in June, Beverly noted that Laury continued to report depression and anxiety and having "no desire to do anything despite advice given." (Tr. 407.) July 2010: "[client] appears to be regressing." (Tr. 406.) A brief respite in September 2010: Laury told Beverly that she was progressing with her journaling and reading to relax; Beverly noted, "Should [decrease] in anxiety as long as she's [at] home." (Tr. 401.) But in October 2010, Laury reported poor concentration "so much so that family members redirect her. Cooking has minimal progress[.] [Client] reports having family members to assist [with] chores." (Tr. 397.)

In November 2010, just three days before Laury's administrative hearing before ALJ Hellman, Laury's counsel deposed Dr. Conic. (Tr. 270-97.) In commenting upon her "Unresolved

8

Grief Rating" of 90% from September 2008, Dr. Conic explained that the score represented Laury's "inability to get beyond someone's death, having no way to bring about a closure or resolution." (Tr. 277.) In remarking upon her earlier "Obsessive Compulsive Rating" of 100%, Dr. Conic explained,

> That is her—the thinking. It is also an anxiety-based disorder where thoughts become obsessions and lead to ritualistic activities to reduce the anxiety that's cause[d] by that obsessive thought. . . . Whereas some people engage in obsessive behaviors, like washing your hands, hers is the thoughts. She cannot get rid of the thought.

(Tr. 282.) Dr. Conic further explained that her 2008 mental status exam revealed "[v]ery low self-esteem, shame, guilt" and that Laury was "not able to come up with logical or rational reasons for occurrences." (Tr. 285.) Regarding the Administration's list of mental impairments, Dr. Conic opined that she had reviewed listings 12.04, 12.06, and 12.08. (Tr. 289-90); *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. And, regarding the "B" criteria associated with those three listings, Dr. Conic testified:

> [LAURY'S COUNSEL:] And does [her depression] also result in at least a marked restriction[] of daily activity in living?
> [DR. CONIC:] Yes.
> Q. And does it also affect her difficulties in maintaining social functioning?
> A. Yes.
> Q. Has it affected her ability to maintain concentration, persistence or pace?
> A. Yes.
> Q. And have there been repeated episodes of decompensation?
> Yes.

(Tr. 290.) Dr. Conic also explained that someone with either the GAF score she assigned to Laury in 2008, 31-40, or the score that Dr. Zaroff assigned to Laury in 2008, 45, would be unable to work. (Tr. 292.) In fact, she opined that Laury would not be able to do "any kind of work at this point," and when counsel asked specifically about "simple unstressful work," Dr. Conic explained that she

would still be at risk of having panic attacks "or paranoid ideation about anything that might happen she may consider a threat to her." (Tr. 295.)

### C. Testimony at the Hearing Before the ALJ

ALJ Hellman asked Laury why she stopped working as a dental assistant in May 2007. Laury explained, "[the job] was just too much stress. I couldn't focus, can't remember things, unable to function." (Tr. 30.) Laury recounted how she had a meeting with the dentist she worked for, and was told that she could not remember things, that she was not setting up rooms fast enough, and that she should go to the doctor. (Tr. 31.)

Plaintiff explained that her "[s]evere anxiety and panic attacks" prevented her from returning to work. (Tr. 30.) She said that she had panic attacks two to three times per week; the attacks would last 20 minutes and involve "fast heartbeats, unable to breathe, thoughts of (INAUDIBLE) going through my head, trembling, nervousness." (Tr. 31-32.) In describing why work would be stressful, Laury explained, "My mind is constantly going. I try to stop thinking but it just goes on and on and on. Can't focus on things." (Tr. 36.) Laury also testified that she saw "sad clowns, witches, [and] snakes," which, to her, represented "to be aware, stay away." (Tr. 44.)

In contrast to the function report she completed in May 2008, Laury testified to limited daily activities at her November 2010 hearing before the ALJ. Although Laury picked up her kids from school and "look[ed] after" them, Laury stated that she cooked "[m]aybe once a week," did no cleaning in the house beginning in 2000, did no shopping, had no hobbies, did not got out of the house, and mostly slept all day. (Tr. 34-35.)

The ALJ solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations approximating Laury's. The ALJ asked about job

10

availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "simple, routine and repetitive tasks with only occasional interaction with the public and occasional interaction with co-workers and supervisors." (Tr. 47.) The expert believed that such an individual could perform a number of "medium" exertion, "unskilled" jobs, including dishwasher, stocker, and assembler at a bench or table. (Tr. 48.)

The ALJ then inquired about a second hypothetical individual with the same limitations as the first, except that the second individual would be limited to the "light" exertion level. (Tr. 48.) The expert stated that this second hypothetical person could also perform a number of jobs, including assembler done at a bench or table, inspector done at a bench or table, and parts packer at a bench or table. (*Id.*)

Next, the ALJ asked about a third hypothetical individual, just as limited as the second, except that this person could only perform "one and two step" tasks. (Tr. 49.) The vocational expert stated that all this third individual could perform the same "light" exertion level jobs as the second. (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the

11

application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Hellman found that Laury had not engaged in substantial gainful activity since her alleged disability onset date of May 9, 2007. (Tr. 12.) At step two, he found that Laury had the following severe impairments: dysthymic disorder, adjustment disorder, and anxiety disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled an listed impairment. (Tr. 12-13.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following limitations: "only occasional interaction with co-workers, supervisors, and the public[] . . . and 1 or 2 step tasks that are simple, routine, and repetitive." (Tr.

13.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 17.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Laury's age, education, work experience, and residual functional capacity. (Tr. 18.) The ALJ therefore concluded that Laury was not disabled as defined by the Social Security Act from the alleged onset date through January 12, 2011, the date of his decision. (Tr. 18.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff's claims of error share a common theme: the ALJ's weighing of the opinion evidence. Plaintiff argues that Dr. Douglass, who found that she was capable of "simple, routine, 2-step tasks on a sustained basis," merely reviewed her medical file and never met or examined her, but, on the other hand, "[t]wo different psychologists, Drs. Conic and Zaroff, as well as two different [c]ounselors, Beverly and Walker, conducted examinations and concluded that [Laury] was totally disabled." (Dkt. 8, Pl.'s Mot. Summ. J. at 16-17.) Thus, in Laury's view, the scale tips decidedly in favor of disability. The Court disagrees with Plaintiff that the record before the ALJ was so one-sided, but agrees with Plaintiff that some of the ALJ's reasons for discounting Dr. Conic's opinion are not supported by substantial evidence and that this prejudiced the disability determination.

As a threshold matter, the parties dispute whether Dr. Conic was a treating source or examining source. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("[Section 404.1527(c)(2)] recognizes that not all medical sources need be treated equally, classifying

14

acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources. . . . A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' her. [20 C.F.R. § 404.1502].”). In many cases, this distinction is critical: absent a good reason for not doing so, an ALJ is to defer, or even adopt, the opinion of a treating-source. *See* 20 C.F.R. §§ 404.1527(c)(2) 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Ultimately, in this particular case, the distinction between examining and treating source is not critical. Resolving the parties' dispute demonstrates why this is so.

In other circumstances, Dr. Conic's affidavit would be both the start and end of the inquiry as to whether she is a treating source. In her affidavit, she provides:

> 6. I have met with [Ms.] Beverly on a regular basis, and while I cannot state with certainty, I would estimate that I would have personally seen Ms. Laury on at least 8 occasions over a two-year term, or at least on a quarterly basis as well as discuss her progress with Ms. Beverly monthly. . . .

> 8. I was able to testify regarding these specific instances because of personal meetings and discussions that I had with Mrs. Laury as well as insight that I gleaned from discussions with Ms Beverly.

(Tr. 412.) In other words, Dr. Conic attested to a treating-source relationship with Laury.

Dr. Conic's affidavit, however, was not part of the record before ALJ Hellman; instead it was first added to the record at the Appeals Council level. (Tr. 4; *see also* Tr. 412.) And where, as here, the Appeals Council denies a claimant's request for review, it is the ALJ's decision that is the final decision of the Commissioner of Social Security. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). It follows that when this Court reviews the Commissioner's decision, it can only evaluate that decision based on information before the ALJ. As ALJ Hellman did not have the benefit of Dr.

Conic's affidavit, the Court cannot find error based on its contents. *See Elliott v. Apfel*, 28 F. App'x 420, 423 (6th Cir. 2002) ("If the Appeals Council declines to review an ALJ's decision, federal courts cannot consider evidence not presented to the ALJ."); *Frazier v. Comm'r of Soc. Sec.*, No. 10-15120, 2012 WL 760799, at *1 n.1 (E.D. Mich. Feb.9, 2012), *report and recommendation adopted*, 2012 WL 760805 (E.D. Mich. Mar.8, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton*, 2 F.3d at 696; *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996))).

The question of whether Dr. Conic was a treating or examining source thus turns on whether the administrative record before ALJ Hellman evidences a longitudinal relationship between Dr. Conic and Laury such that Dr. Conic could provide a "detailed" picture of Laury's condition that a one-time examining or file-review physician could not. *See* 20 C.F.R. § 404.1527(c)(2). On this point, the Court acknowledges that the ALJ found that Dr. Conic had seen Laury on only one occasion (Tr. 16), and our Court of Appeals has stated that "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship," *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006).

But the ALJ's conclusion as to the number of times Dr. Conic saw Laury is not supported by substantial evidence. True, a review of the administrative record before the ALJ, with special attention to Laury's mental-health treatment beginning in September 2008, uncovered only one

16

record authored by Dr. Conic: an "Assessment Report" based on a September 15, 2008 interview of Laury. (Tr. 392-95 (Assessment Report).) But a review of Dr. Conic's deposition leads to the conclusion that she must have seen Laury on at least one other occasion, and probably more. In particular, Dr. Conic testified about the death of Laury's daughter. (Tr. 279-82.) This occurred after Dr. Conic completed the September 2008 Assessment Report and the details Dr. Conic recounted extend beyond any of Beverly's treatment notes. (*See* Tr. 279-80.) The strong inference, therefore, is that Dr. Conic evaluated Laury on more than one occasion.

Additionally, other parts of Dr. Conic's deposition testimony indicate greater familiarity with Laury than acknowledged by the ALJ. For example, Dr. Conic testified that she worked with Dr. Brooks, the physician who prescribed Laury's anxiety medication. (Tr. 293.) Further, the deposition transcript makes plain that Dr. Conic had reviewed the consultative examination report by Dr. Zaroff and Walker. (Tr. 294.) Further still, Dr. Conic testified, "[Laury] does not participate in any of her usual family activities. She does not go out. She does not go to church. She is pretty much shut down." (Tr. 289.) Dr. Conic's use of the present tense finds support in Beverly's notes about Laury's activity in the weeks immediately prior to Dr. Conic's deposition. (*See* Tr. 396-99.) In turn, this suggests that Laury had reviewed Beverly's progress notes or otherwise had interviewed Laury yet again.

All of this strongly suggests that, at least by the time of her November 2010 deposition, Dr. Conic was a treating source. But even if Dr. Conic's relationship with Laury fell short of that standard, Dr. Conic was at a minimum an examining source with atypical knowledge of Laury. She saw Laury at least twice, had familiarity with Laury's treatment with Dr. Brooks, considered Laury's evaluation by Dr. Zaroff and Walker, and may have even reviewed Beverly's treatment notes.

Yet, despite all of this, the ALJ placed considerable weight on the fact that "Dr. Conic ha[d] not interviewed the claimant at any time [after September 2008]." (*See* Tr. 16.) In other words, the ALJ discounted Dr. Conic's opinion because he believed that she lacked familiarity with Laury when, in fact, her deposition evidenced that she had much greater familiarity with Laury than Dr. Douglass—a file-review physician whose opinion the ALJ assigned "considerable" weight. (*See* Tr. 16-17.)

While the ALJ's erroneous conclusion about Dr. Conic's familiarity with Laury may not, on its own, justify remand, some of the ALJ's other reasons for discounting Dr. Conic's opinion also lack substantial evidentiary support. *First*, the ALJ was explicit that Beverly's treatment notes indicated that Laury's anxiety and depression had improved over time. (Tr. 16, 17.) The ALJ then used that conclusion as a basis for discrediting Dr. Conic's work-preclusive assessment. (*See* Tr. 17.) But, as detailed in this Court's summary of the administrative record, *see* Part I.B.2., Beverly's treatment notes indicate that Laury's condition at best stayed the same between September 2008 and November 2010 (when Dr. Conic was deposed). Indeed, in the months leading up to Dr. Conic's deposition, Laury "appeared stress[ed]" (Tr. 403) and reported an "inability to focus," "experiencing a trance like state," and "functioning [without] awareness of her actions" (Tr. 399).

*Second*, the ALJ discounted Dr. Conic's opinion because the psychologist opined on some issues that the social security regulations reserve for the Administration and its adjudicators. (Tr. 17.) It is indeed black-letter law that an ALJ owes no special deference to a physician's opinion on issues that "are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." *See* 20 C.F.R. § 404.1527(d). But the ALJ seemingly overlooked the fact that Dr. Conic appears to have opined that Laury would not be able to perform

simple work in a low-stress environment:

> [LAURY'S COUNSEL:] Okay. Do you have an opinion, Dr. Conic, since the time you've been seeing Ms. Laury as to whether she is able to engage in any type of active gainful employment? Do you have an opinion?
> [DR. CONIC:] I don't think that she's able to do any kind of work at this point.
> Q. Even simple unstressful work she would still be at risk of having panic attacks and the like?
> A. Yes, or paranoid ideation about anything that might happen she may consider a threat to her.
> Q. Would that impede her ability to take orders and deal with either bosses or subordinates or the public?
> A. Yes.

(Tr. 295.) The functional nature of this testimony is comparable to the functional nature of Dr. Douglass' statement that Laury "retains the capacity to perform simple, routine, 2-step tasks on a sustained basis." (Tr. 258.) Yet the ALJ credited the latter statement without even mentioning the former.

*Third*, the ALJ rejected Dr. Conic's opinion that Laury was markedly limited in her activities of daily living by relying on Laury's self-completed function report. (Tr. 13 (citing Tr. 289-90).) But the ALJ said nothing about the fact that Laury completed her function report in May 2008—more than two years before Dr. Conic's testimony. (*Compare* Tr. 159, *with* Tr. 270, 289-90.) As already noted, in the months and weeks leading up to Dr. Conic's deposition, Laury was reporting to Beverly anything but a robust set of daily activities.

On top of all of this, the general rule is that the opinions of an examining physician, such as Dr. Conic, should be given more weight than that of file-review physician, such as Dr. Douglass. 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.").

The foregoing suggests that substantial evidence does not support the ALJ's decision to credit Dr. Douglass' file-review opinion over Dr. Conic's opinion. But the Court would be remiss if it did not note that the ALJ had at least one good reason for discounting Dr. Conic's opinion.

In September 2008, Plaintiff told Dr. Conic that over the prior six months, her auditory and visual hallucinations had increased, including "clown like characters that follow[ed] her and [told] her to hurt herself or others." (Tr. 395.) Based in significant part on Laury's reports of hallucinations, Dr. Conic diagnosed Plaintiff with schizophrenia, paranoid type:

> [LAURY'S COUNSEL:] Now, you also note in your diagnosis [in the September 2008 Assessment Report] "Axis I, Schizophrenia, paranoid Type." What do you base that on?
>
> [DR. CONIC:] On her thought disorder, one of the major characterizations of schizophrenia, paranoid type is the thought disorder, the irrational thinking . . . that no rationale argument can convince her otherwise.
>
> Also the feeling that entities are in the room with her that tell her that she's weak, that this is all her fault or that she can't keep her family together. She's taunted by[—]she says sometimes they appear . . . like clowns that just appear and just taunt her.

(Tr. 286-87.)

Yet, the clown-like delusions Laury reported to Dr. Conic in September 2008 do not appear in Dr. Zaroff and Walker's July 2008 consultative report, they are not reflected in Dr. Brooks' treatment notes, and they are not mentioned in Beverly's therapy notes. The absence of any indication of hallucinations in Dr. Zaroff and Walker's report is conspicuous given both their fairly thorough summary of Plaintiff's symptoms and that their evaluation was only two months before Dr. Conic's. (*See generally* Tr. 236-39.) Similarly, Beverly's notes correspond to over 100 sessions, yet, after careful review, the Court cannot find one instance where Laury reported clown-like

20

delusions. (*See* Tr. 300-391, 396-409.)

This inconsistency constitutes substantial evidence supporting the following reasoning provided by the ALJ:

> Of note, the claimant had a consultative examination two months before Dr. Conic interviewed her. At the consultative examination, there was no mention of hallucinations or obsessions. Yet she was quite elaborate in her history to Dr. Conic. I also noted that Dr. Gary Brooks did not even document all the complaints that she mentioned to Dr. Conic (Exhibits 8F and 1F). For someone who allegedly has schizophrenia and the other impairments that Dr. Conic reported, the claimant showed a short history of treatment.

(Tr. 16-17.)

In sum, on the one hand, the ALJ erred in discounting Dr. Conic's opinion based on the mistaken belief that Dr. Conic had only seen Laury once. Indeed, contrary to the ALJ's implication that Dr. Conic lacked knowledge of Laury, she was, in fact, much more familiar with Laury than Dr. Douglass (and she might even be a treating source). Moreover, as discussed, several of the ALJ's other reasons for discounting Dr. Conic's opinion are at best questionable and, at worst, unsupportable. Given the several errors committed by the ALJ, the Court does not believe this is a case where the Court can confidently conclude that Plaintiff's disability case was not prejudiced on the merits. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009); *Juarez v. Astrue*, No. 2:09-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010) ("*Rabbers* holds that an error is harmless only when 'concrete factual and medical evidence' is 'apparent in the record' and shows that even if the ALJ had made the required findings, the ALJ *would have* found the claimant not disabled." (quoting *Rabbers*, 582 F.3d at 657-58)). Remand, of some type, is therefore warranted.

On the other hand, the ALJ correctly recognized that Dr. Conic's opinion of Laury's ability to function may have been based in part on an inaccurate self-report from Laury. Still, it is not clear

21

that this potential basis for discounting Dr. Conic's opinion is substantial reason for crediting Dr. Douglass' opinion over Dr. Conic's. The Court therefore believes that this case should be remanded for the ALJ to reconsider the relative weight assigned to Dr. Conic's opinion as compared to that of Dr. Douglass. *See Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) ("If a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 10) be DENIED, and that this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich.

LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 20, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 20, 2013.

s/Jane Johnson
Deputy Clerk

23